Saul 8. Stbeit, J.
Petitioners seek to enjoin and restrain respondents from collecting and enforcing a transit fare on the facilities of the New York City Transit Authority in excess of 20 cents, pending the holding of a public hearing on the subject of any proposed increase in such fare.
At the hearing before this court, on the motion for an injunction pendente lite, petitioners, upon consent of counsel, added the New York City Transit Authority as a party respondent to this proceeding.
Initially, it must be observed there can be little doubt that the State of New York, its Governor and its Comptroller are not proper parties herein. It is fundamental that the State is immune from suit unless, as in the case of matters authorized to be brought before the Court of Claims, such inherent immunity has been waived by the Legislature (Kagen v. Kagen, 21 N Y 2d 532, 538; Niagara Falls Power Co. v. White, 292 N. Y. 472, 479; see, also, Mathewson v. New York State Thruway Auth., 11 A D 2d 782, affd. 9 N Y 2d 788). Similarly, the Governor has been held to be free from judicial control in the performance of executive powers and his acts in his official capacity have long been deemed to be without the scope of judicial review (see Gaynor v. Rockefeller, 21 A D 2d 92, 98, affd. 15 N Y 2d 120; see, also, Matter of Donnelly v. Roosevelt, 144 Misc. 525, 532; Nickerson v. Rockefeller, N. Y. L. J., Sept. 24, 1969, p. 15, col. 5).
Furthermore, beyond this immunity, inasmuch as it does not appear that the State, or either the Governor or Comptroller of the State of New York had any jurisdiction over the fare increase adopted by the New York City Transit Authority, there can be no legal basis for the claim by petitioners against these “ State ” respondents.
The facts surrounding the instant application are public knowledge and require little repetition here. Suffice it to note *944 that on January 2, 1970, without any prior public hearing, respondent New York City Transit Authority (hereinafter referred to as “Transit Authority ”), by appropriate resolution, raised transit fares from 20 to 30 cents. This action purportedly was necessitated by the fact that the Transit Authority, in its judgment, had concluded it did not have sufficient funds to continue its operations on a self-sustaining basis, as mandated by law (see Public Authorities Law, § 1205, subd. 1).
Petitioners argue, however, that while the cited section of the law grants the power and basis upon which city transit fares may be fixed, nevertheless, subdivision 3 of section 1266 of the Public Authorities Law sets forth the manner and method by which such fares may be increased and expressly mandates a public hearing prior to such change by the Transit Authority as a “ subsidiary ” of the Metropolitan Transportation Authority (hereinafter referred to as “ MTA ”). They further assert that, even absent a specific statutory requirement for a public hearing, Federal and State constitutional guarantees of ‘ ‘ due process of law” and “equal protection óf the laws ” require notice and an (Opportunity for the persons affected thereby to be heard by a\ governmental body before it may act in an area of vital concern to the rights, property and welfare of the citizens of the community.
While it is unnecessary here to explore petitioners’ charge of discrimination, there can be no doubt that the subject fare increase is of greater import and of far more concern to the poor and economically disadvantaged persons than to the more affluent or “ comfortable ” members of our city. Nevertheless, the change in the daily cost of public transportation within the City of New York does, directly or indirectly, affect all of our citizens. Unfortunately, therefore, I am constrained to hold that despite their laudable and legitimate efforts to reverse what they deem to be an illegally imposed and oppressive burden on less fortunate citizens, petitioners do not have the legal standing or capacity to assume the role of champions of the community. It has long been the established law of this State that, where, as here, the wrong complained of is, in fact, a “ public injury ”, and the right violated is a “ public right ”, no private person (or number of persons) can maintain an action for an injunction, or for any other relief, unless he suffers a special injury different from that suffered by the public at large (see Doolittle v. Supervisors of Broome County, 18 N. Y. 155, 163 [1858]; see, also, Schieffelin v. Komfort, 212 N. Y. 520; McGovern Trucking Co. v. Moses, 16 Misc 2d 72, 74, affd. *945 277 App. Div. 758; New York League for Separation of Church & State v. Graves, 170 Misc. 196, 198; Wallace v. New York City Tr. Auth., N. Y. L. J., July 7, 1966, p. 11, col. 7).
In this respect, it is noteworthy that the recently proposed new State Constitution had embodied provisions which, if enacted, would have served, in large measure, to cure the present legal disability and would have given each citizen of this State a voice and the right to seek relief similar to the instant proceeding instituted by petitioners. For example, the following provision was set forth in the recommended (C Bill of Rights
“ article I, § 2. Any citizen of this state shall have the right to maintain a judicial action or proceeding against any officer, employee, or instrumentality of the state or a political subdivision thereof, to restrain a violation of the provisions of this constitution or the constitution of the United States, including unconstitutional expenditures. The legislature may provide for such action or proceeding.” (Emphasis added.)
With the ultimate rejection by the electorate of the proposed Constitution, it is apparent petitioners remain completely without standing to enjoin the fare increase, as sought here (supra; see, also, Klein v. O’Dwyer, 192 Misc. 421; Matter of Love, 155 N. Y. S. 2d 266).
Without such legislative sanction, it necessarily follows that petitioners are also not in a position to complain of the allocation of funds by the State for the maintenance and improvement of transit facilities (St. Clair v. Yonkers Raceway, 13 N Y 2d 72, cert. den. 375 U. S. 970; Matter of Donohue v. Cornelius, 17 N Y 2d 390, 397; Matter of Blaikie, 11 A D 2d 196; see, also, Matter of Natapow v. Epstein, 35 Misc 2d 813, affd. 19 A D 2d 591; Matter of Hattem v. Silver, 19 Misc 2d 1091, 1092). Moreover, while its aims may be purposeful and worthy of approbation, petitioner Straphangers United, as an unincorporated association, is clearly devoid of legal capacity herein (NAACP v. Alabama ex rel. Patterson, 357 U. S. 449, 459; Tileston v. Ullman, 318 U. S. 44).
Respondents note that the decision to increase the transit fare was, in effect, a legislative act. They argue, therefore, that the Supreme Court of this State ‘‘ may not assume supervisory power over officers chosen directly or indirectly by the People to run their municipal affairs ” (citing Wallace v. New York City Tr. Auth., supra; Matter of Walsh v. La Guardia, 269 N. Y. 437). Nevertheless, this, by itself, does not detract, in any manner, from the serious issues raised by petitioners in this proceeding which will be discussed hereinafter.
*946 It .is noteworthy that, like the fare increase itself, many of the related problems indicated by the moving papers are the direct result of prior legislative acts. For example, with the creation of MTA, the Legislature, in its wisdom, in effect, . dictated that control of both metropolitan commuter transportation and the city’s transit system be vested in the same individuals, albeit they operate under two distinct nomenclatures, namely the “ Metropolitan Transportation Authority ” [MTA] and the “ New York City Transit Authority ” (see Public Authorities Law, §§ 1201, 1263 and 1264). Significantly, as set forth in subdivision 1 of section 1201 of the Public Authorities Law, the board of the Transit Authority is wholly comprised of ‘ ‘ those members * * * who * * * hold the offices of chairman [respondent Honan] and members of the metropolitan transportation authority ’ ’. Thus, adopting, arguendo, respondents’ contention here regarding the absence of a need for a public hearing prior to the subject fare increase, the constitutional questions raised by petitioners (by which they seek standing herein) immediately become apparent. On the one hand, .the Transit Authority has legislative sanction to adjust rates of fare as, in its judgment alone and without publiG hearing, it deems necessary to maintain the transit operations on a self-sustaining basis (see Public Authorities Law, § 1205, subd. 1). On the other hand, however, the very same individuals, when acting in their other capacity as the MTA, must have a prior public hearing in order to change fares of transportation facilities they operate (other than the city’s .transit system). This requirement is explicitly set forth in subdivision 3 of section 1266 of the Public Authorities Law. Nevertheless, contrary to the relief sought herein, the legislative distinction in the operation and fixation of fares by the two authorities concerned cannot be obliterated by judicial intervention, but must await corrective or ameliorative legislative action if the aims of petitioners are to be realized. Until such time, the broad discretion vested in the Transit Authority by virtue of the provisions of subdivision 1 of section 1205 of the Public Authorities Law also precludes judicial scrutiny as to the manner and method in which it has arrived at a determination for the necessity of a 50% fare increase to maintain a “ self-sustaining” transit operation in the City of New York.
As above indicated, in an effort ¡to obtain judicial relief, petitioners have set forth in their “ petition and complaint ” various alleged constitutional infringements of their rights. Thus, they assert that respondents’ failure to hold public hearings “in ope part of its jurisdiction, while holding them before raising *947 fares in another part of its district violates the rights of [petitioners] and their class to equal protection of the laws ”,
I do not agree. Contrary to petitioners’ contention, nothing in the applicable statutes creating the two authorities here involved or in the moving papers before the court warrants the conclusion, as they urge, that, notwithstanding the explicit provisions of section 1205, the Transit Authority, in fact, is a f 1 subsidiary ” of MTA within the scope and intendment of the provisions of subdivision 3 of section 1266 of the Public Authorities Law, which mandate a prior public hearing (supra). As already noted, the Legislature has conferred on the Transit Authority, as distinguished from MTA, the right to fix its fares without such public bearing, £< Notwithstanding the provisions of any other law ”. It is noteworthy that section 1205 of the Public Authorities Law, pursuant to which the Transit Authority directed the subject increase of fares, was originally enacted in 1957. Significantly, it was then substantially re-enacted with the subsequent creation by the Legislature of MTA.
Moreover, in addition to the fact the Transit Authority was in existence for many years before the MTA, various powers still vested by law in the Transit Authority alone (in apposition to the powers granted to ££ corporate arms ” of MTA) refute petitioners’ argument that, in reality, the Transit Authority is merely a subsidiary of the later legislative creation [I In this regard, it is to be noted that subdivision 5 of section of the Public Authorities Law, provides, inter alia, that each of the subsidiaries of MTA ££ shall have all those powers vested in the authority * * * except the power to contract indebtedness.” (Emphasis added.) However, unlike this specific exclusionary provision, the Transit Authority is expressly empowered to incur such monetary obligations (see Public Authorities Law, § 1203 et seq.; [e.g., §§ 1207, 1207-b]).
Likewise, additional indicia of the lack of merit in petitioners ’ position as to the subservient status of the Transit Authority are contained in the explicit provisions of section 1219 of the Public Authorities Law, which mandate that, upon the termination of this authority’s lease agreement with the City of Hew 'fork, all of its properties u shall pass to the city and the city shall succeed to the rights, powers, duties and obligations of the authority”. (Emphasis added.)
In still further rebuttal of the alleged ££ parent-subsidiary ” relationship, it is also of vital significance that, unlike the MTA, the standard applicable to the Transit Authority for deú-wírdn • ing the mandated ££ self-sustaining basis ” (supra) specifically excludes capital costs [which are required to be paid by the *948 City of New York] (see Public Authorities Law, §§ 1202, 1203 and 1205). Obviously, therefore, as respondents contend (and as petitioners undoubtedly will agree), the Legislature did not intend transit rates in the city’s transportation system to be based on amounts necessary to maintain MTA commuter facilities on a self-sustaining basis pursuant to subdivision 3 of section 1266 of the Public Authorities Law. Conversely, it is apparent the Legislature also did not intend that suburban residents of the metropolitan area pay charges to sustain, not only the operation of the city’s transit .system, but its capital costs as well. Nevertheless, such an unwarranted and erroneous conclusion would necessarily f ollow if this court were ¡to accept and adopt petitioners’ assertion here that the provisions of subdivision 3 of section 1266 govern the fixation of fares on the facilities of the Transit Authority to the exclusion of the clear, unambiguous and prior existing legislative edict set forth in section 1205.
Thus, I find no reasonable basis to conclude that the purpose or intent of the Legislature was to create a ‘ ‘ parent-subsidiary ’ ’ relationship between the MTA and the Transit Authority. The fact (that the members of the respective boards of each such authority are the same is not sufficient to make petitioners’ argument tenable. The sole purpose of this arrangement was to place the Transit Authority, together with the Triboro Bridge and Tunnel Authority, ‘1 under common control by a single board and to impose upon that hoard the additional responsibility of developing and implementing a unified mass transportation policy for such region” (L. 1967, ch. 717, § 60, 1 ‘ Legislative findings and declaration of purpose”; emphasis added). This 1 ‘ policy ’ ’ intent is clearly enunciated in similar language set forth in section 1264 of the Public Authorities Law, as amended in 1967. However, the desirable aim of achieving a11 unified mass transportation policy ” does not, ipso facto, lend itself to petitioners’ immediate conclusion that the acts of the Transit Authority are, in reality, the acts of the MTA. On the contrary, it is not at all unique in government service for key officials and employees, on occasions, to wear ‘ ‘ two hats ’ ’ but, nonetheless, as here, to function independently in each separate capacity.
Similarly, the fact the State has deemed it advisable to allocate funds for suburban commuter services provides no valid ground for a citizen of this city to elaim a denial of “ equal protection of the laws ”, as alleged by petitioner. There is m constitutional requirement that identical grants be made to each district within a Slate for purposes permitted by law (see Mclnnis v. Shapiro, 293 F. Supp. 327, 336, affd. sub nom. McInnis v. *949 Ogilvie, 394 U. S. 322; Detroit Edison Co. v. East China Township School Dist. No. 3, 247 F. Supp. 296, affd. 378 F. 2d 225, cert. den. 389 U. S. 932; South Carolina v. Katzenbach, 383 U. S. 301, 328).
Clearly, the particular agencies concerned with the receipt of such grants, as instrumentalities of the State, could have no basis for constitutional objection to alleged disproportionate allocation of funds. It follows, therefore, that individuals can have no greater rights, with or without a public hearing (see Salzman v. Impellitteri, 203 Misc. 486, affd. 281 App. Div. 1023, mod. 305 N. Y. 414).
Petitioners’ constitutional argument regarding u due process of law ”, in my opinion, also lacks merit. It may be noted that as far back as 1924, the Legislature of this State fixed fares on the Rapid Transit lines in New York City (see L. 1924, ch. 573). It cannot be disputed that such authority may properly be delegated by the Legislature to another State agency, as, in fact, it did here (see Matter of Village of Saratoga Springs v. Saratoga Gas, Elec. Light & Power Co., 191 N. Y. 123). However, upon such transfer of authority, the fixation of fares and charges to be paid by users still remains a legislative function, without any constitutional reauirement for the holding of a public hearing, as petitioners have urged herein [supra: see, also, Bi-Metallic Co. v. Colorado, 239 U. S. 441; Ortega Co. v. Triay, 260 U. S. 103, 110; St. Joseph Stock Yards Co. v. United States, 298 U. S. 38).
However, the right to a public hearing and to public scrutiny of the administrative decisions of elected or appointed representatives of the community cannot cavalierly be dismissed as an ethereal goal or an impalpable principle of law, abstractly appealing only to an inquisitive segment of the public. On the contrary, it goes to the heart of the fundamental fairness which is required of all governmental agencies, officers and employees when dealing with the citizens of the State or their affairs.
Had such right been available to petitioners in the first instance whereby they could have tested, in a public forum, (1) the accuracy of the amount claimed by the Transit Authority as an operating deficit, (2) the accounting and fiscal methods employed by this agency to arrive at its determination regarding its annual financial condition and (3) the reasonableness of the fare increase petitioners now claim to be arbitrary and illegal, perhaps recourse to the courts would have been unnecessary and wholly avoided. At this posture of the law, however, as above set forth, there appears to be no way in which petitioners, or any other individual citizen of this community, can *950 properly place before a judicial tribunal either the propriety or legality of the exercise of judgment vested by the Legislature in the members of the Transit Authority which resulted in the subject increase of fare in the City of New York. Reluctantly, in the absence of a clear violation of some constitutional mandate, which petitioners have here failed to establish (supra), it must be concluded that these issues remain unresolved at law (Gaynor v. Rockefeller, 15 N Y 2d 120, 131, supra; Matter of Love, 155 N. Y. S. 2d 266, 272, supra). It is beyond the judicial function for this court to substitute its opinion for that of the Legislature (McDonald v. Board of Election, 394 U. S. 802, 809; Snell v. Wyman, 281 F. Supp. 853, 862-863, affd. 393 U, S. 323; Matter of Park East Land Corp. v. Finkelstein, 299 N. Y. 70, 75; Matter of County of Nassau v. Metropolitan Tr. Auth., 57 Misc 2d 1025, 1030; see, also, New York Compensation Ins. Rating Bd. v. Superintendent of Insurance, 8 A D 2d 455, affd. 8 N Y 2d 803; Matter of Perman Realty Corp. v. Weaver, 3 A D 2d 723, affd. 3 N Y 2d 821).
This elective body, however, should and must be responsive to the urgent problems of mass transportation which cannot be considered by the courts in its place. Nothing can better demonstrate the necessity for immediate action and deep concern by appropriate public officials than the frustration which undoubtedly .results from the inability of a citizen to obtain redress or to seek an avenue of recourse for the alleviation of a dire need for efficient and adequate transportation and the vexing problem of its financing. In order to help insure a healthy economy for the State, the city and the New York metropolitan area, the provision of adequate transit facilities for the transportation of persons must be assured. Therefore, despite the lack of specific legislative mandate in each area of the law, (supra), it is in the public interest for the State and its political subdivisions, in co-operation with all levels of government and their administrative agencies, to give heed to the voice of the citizens of our community in their urgent quest for the creation, maintenance and preservation of essential transit services.
However, while the socio-economic factors, so eloquently and ably pointed out by each of petitioners? counsel on the argument of this application, are most persuasive, nevertheless, and unfortunately, under existing legal standards, they do not afford sufficient foundation or a proper basis, as a. matter of law, for the drastic injunctive relief sought here.
Accordingly, the application is denied and the petition is dismissed,