In the Matter of BENJAMIN CULLUM et al., Petitioners, *v.* JOHN F. O'MARA et al., Respondents.

JOHN TAYLOR, Petitioner, *v.* ROBERT J. SISE, Respondent.

BERNARDO ROBLES, Petitioner, *v.* DUNCAN McNABB, Respondent.

MANNY PRICE, Also Known as EMANUEL RAYSOR, Petitioner, *v.* LUIGI MARANO, Respondent.

Second Department, December 7, 1973.

*Elizabeth B. DuBois, James D. Silbert* and *Mark C. Morril* (*Barry Krinsky* of counsel), for Benjamin Cullum and others, petitioners.

*William Gallagher* (*Robert Hermann, Randolph Jonakait, John Stackhouse* and *Donald Zeigler* of counsel), for John Taylor and others, petitioners.

*Louis J. Lefkowitz, Attorney-General* (*Irving Galt* and *A. Seth Greenwald* of counsel), for respondents.

SHAPIRO, J. In two proceedings commenced in this court pursuant to article 78 of the CPLR, we are called upon to determine the constitutionality of certain provisions of chapter 603 of the Laws of 1973. At issue are the validity of the authorization for the Governor, with the advice and consent of the Senate, to appoint (prior to July 1, 1974) up to 68 additional Judges to the Court of Claims and the conferring of certain responsibilities with regard to judicial administration upon the Commissioner of the Division of Criminal Justice Services.

The first proceeding (which for purposes of convenience shall be referred to as the " Taylor " proceeding) consists of applications by three persons, each of whom is represented by the Legal Aid Society and against whom criminal cases are now pending before one or another of the Judges appointed to the Court of Claims by the Governor pursuant to chapter 603 and who have been temporarily assigned to sit in the Supreme Court. They seek to prohibit those Judges from presiding over their trials on the ground that the portion of the statute which created their positions is unconstitutional.

The second proceeding (to be referred to as the " Cullum " proceeding) was commenced by five individuals on behalf of themselves and for the benefit of others similarly situated. They, too, are defendants whose cases are pending in the Supreme Court, Kings County, before some of the newly appointed Court of Claims Judges. They are represented by attorneys associated with the Legal Action Center of the City of New York, Inc. This proceeding seeks (a) to prohibit:

1. The five Judges named therein from taking action with respect to the cases now before them or which might come before them, including proceedings related to the petitioners;

2. Justices of the Supreme Court to whom such cases might be transferred by the said five Court of Claims Judges acting as Justices of the Supreme Court from taking any action with respect thereto;

3. Respondent Gold, the District Attorney of Kings County, from prosecuting cases which may come before the named or other Judges on assignment from the Court of Claims, including those involving the petitioners;

4. The Governor from appointing additional Court of Claims Judges pursuant to chapter 603;

5. The Governor from interfering in the administration of the State judicial system; and

6. The Commissioner of the State Division of Criminal Justice Services from interfering in the State judicial system; and (b) to vacate:

1. The assignment of the said five Judges from the Court of Claims to the Supreme Court, Kings County; and

2. The appointments of the five Judges to the Court of Claims.

The major thrust of the Taylor proceeding is that portions of chapter 603 are unconstitutional in that they, in effect, provide for the appointment of Supreme Court Judges by the Governor in the guise of appointments to the Court of Claims. The Cullum proceeding takes the same position and goes on to allege that chapter 603 is unconstitutional for the further reason that it violates constitutional principles with regard to the separation of powers.

In each proceeding, the respondents therein have moved to dismiss the petition.

Both proceedings, at least insofar as they are directed against Judges now sitting on assignment as Acting Justices of the Supreme Court, have been properly commenced in this court (CPLR 7804, subd. [b]; CPLR 506, subd. [b], par. 1).

THE BACKGROUND AGAINST WHICH THE STATUTE WAS ENACTED

Governor Rockefeller's 1973 State of the State message proposed sweeping changes in the law with regard to the illegal possession and sale of narcotic drugs. The primary features of the proposal were stiffer penalties for violators of the law, coupled with increased restrictions on plea bargaining. There was widespread fear that these proposals would break the back of the already overburdened criminal justice system. Presiding Justice RABIN commented that if all defendants in drug cases had to be tried, " we'd have to multiply by many, many times the number of judges, nonjudicial personnel, ancillary personnel. And as a practical matter, I don't think that it's presently within the realm of possibilities." Presiding Justice STEVENS indicated

that the proposed law would hopelessly tie up the courts (*New York Times*, Jan. 6, 1973, p. 1, col. 6).

On January 30, 1973 the Governor appeared before a joint hearing of the State Senate and Assembly Codes Committees and requested that he be given the power to appoint an additional 100 temporary Supreme Court Justices to handle the anticipated narcotics workload. Thereafter, when asked at a press conference whether the appointment of additional Supreme Court Justices would violate the State Constitution, the Governor replied, " It's only unconstitutional if you call them a Supreme Court judge. Call them something else, it's constitutional " (*New York Times*, May 5, 1973, p. 35, cols. 1, 2).

The Governor's drug bill was signed into law on May 8, 1973, following its passage through both houses of the Legislature (L. 1973, chs. 276, 277, 278). On June 11, 1973 the Legislature passed, and the Governor signed, the statute now under consideration (L. 1973, ch. 603). This statute, *inter alia*, amended section 140-a of the Judiciary Law by increasing the number of Supreme Court Justices in each of the State's 11 Judicial Districts, save for the First and Second Judicial Districts; increased the number of Judges in certain other courts and authorized the appointment of up to 68 additional Judges of the Court of Claims, such additional Judges to be appointed for nine-year terms. The terms of the additional Court of Claims Judges are of the same duration as the terms of the regular 17 Judges of that court (the Legislature had, earlier in the session, increased from 16 to 17 the number of regular Judges of that court [L. 1973, ch. 777]), except that their positions are not subject to succession either upon expiration of the nine-year term or upon vacancies resulting from any cause.

During the debate on the instant bill on the floor of the State Senate, Senator Gordon, the sponsor of the bill, stated, " These appointments of the judges of the Court of Claims, the 68 authorized additional judges, are for one purpose and for one purpose only and that's the problem of narcotics " (Transcript of Debate in New York Senate on Chapter 603, N. Y. Session Laws of 1973, p. 4203).

At its outset, section 1 of chapter 603 describes its purpose as the establishment of an emergency dangerous drug control program, which shall include, to the extent demonstrated to be necessary, the use of up to 100 additional Judges authorized by the act.

The 16 additional Court of Claims Judges thus far appointed have all been assigned to Criminal Parts of the Supreme Court.

PROVISIONS OF ARTICLE VI OF THE STATE CONSTITUTION

Subdivision a of section 7 provides, in relevant part, that in the City of New York the Supreme Court shall have exclusive jurisdiction over crimes prosecuted by indictment, save for misdemeanors prosecuted by indictment and crimes and offenses by or against minors or resulting from certain intrafamily relationships. Subdivision b of section 26 provides that Judges of the Court of Claims may be temporarily assigned to the Supreme Court in any Judicial District. Other subdivisions of section 26 authorize temporary assignments to the Supreme Court of Judges of other courts. Subdivision d of section 6 provides that the Legislature may increase the number of Supreme Court Justices in any Judicial District to a maximum of one per each 50,000 of population thereof. Pursuant to that provision, the Justices in the Second Judicial District could have been increased by 19 or 20. Subdivision c of section 6 provides that Justices of the Supreme Court shall be chosen by the electors of the Judicial District in which they are to serve. Section 9 provides that the Court of Claims shall have jurisdiction to hear claims by or against the State or between conflicting claimants as the Legislature may provide.

THE PETITIONERS' STANDING TO TEST THE RIGHT OF THE RESPONDENT
JUDGES TO THEIR OFFICE

The Attorney-General of the State argues that the petitioners lack standing to test the right of the respondent Court of Claims Judges to occupy the judicial office to which they have been appointed by the Governor. In *Sylvia Lake Co.* v. *Northern Ore Co.* (242 N. Y. 144) the court reaffirmed the principle that the acts of a *de facto* Judge are valid and the attempt collaterally to attack the propriety of the Judge's appointment was rejected. That case is not authoritative on the factual pattern now before us, for here we have a direct attack made before the Judges act in proceedings to which the Judges are parties and in which the question of the validity of their office is directly raised.

In *Curtin* v. *Barton* (139 N. Y. 505) the court, by way of dictum, stated that only the State may test the right of a Judge to hold office, pointing out that it would be unseemly for that question to be raised against a Judge in the course of a case over which he was presiding. However, it noted that such a cause would lie in an action or proceeding to which the Judge himself is a party and in which the issue of validity of his election or appointment is directly at issue. This is such a case.

Section 63-b of the Executive Law authorizes the Attorney-General to bring a quo warranto proceeding against the usurper of a public office. Query: Is quo warranto an exclusive remedy? I think not.

In *People ex rel. Corscadden v. Howe* (177 N. Y. 499, 505–506) the court noted that the questions of removal of public officers and the determination of title to public office belong exclusively to the courts of law, to be resolved by mandamus, prohibition or quo warranto as the circumstances of the case and the mode of procedure may require. In *Matter of Vescio v. City Manager of City of Yonkers* (69 Misc 2d 68, affd. 41 A D 2d 833) the court held that section 63-b of the Executive Law does not provide an exclusive remedy. It determined that quo warranto is the appropriate remedy in a case involving fact questions between disputing claimants, but that an article 78 proceeding may be invoked where the question is one of law.

I therefore conclude that the petitioners have standing to attack the constitutionality of the statute authorizing the appointment of the additional Judges. The issue is one of far reaching importance and the questions which could later arise as to the validity of the orders and judgments to be made by these Judges are questions which require resolution (see *Matter of Spillane v. Katz*, 25 N Y 2d 34).

### THE ADDITIONAL JUDGESHIPS

The Constitution of this State is clear. Felony indictments in New York City are to be tried by elected Justices of the Supreme Court or by Justices appointed for a limited period as the result of a vacancy. Additionally, Judges of certain other courts, including the Court of Claims, may be *temporarily* assigned to serve in the Supreme Court.

The issue for resolution here is whether the creation of additional Court of Claims Judges with the expressed statutory intention that they be assigned to the Supreme Court for the duration of the emergency created by the enactment of the new drug laws is improper. Phrased otherwise, the issue is whether such an assignment may truly be viewed as temporary.

We begin by noting that a strong presumption of constitutionality attaches to all legislation (*Wasmuth v. Allen,* 14 N Y 2d 391, 397; *Defiance Milk Prods. Co. v. Du Mond,* 309 N. Y. 537, 540) and that there is a further presumption that the Legislature has investigated and found the facts necessary to support the legislation (*I. L. F. Y. Co. v. Temporary State Housing Rent Comm.,* 10 N Y 2d 263, 269; *Lincoln Bldg. Assoc. v. Barr,* 1 N Y

2d 413). Those who attack the constitutionality of legislative enactments must demonstrate their invalidity beyond a reasonable doubt (*People* v. *Pagnotta,* 25 N Y 2d 333, 337). The enactments will be struck down only as a last and unavoidable resort (*Nettleton Co.* v. *Diamond,* 27 N Y 2d 182, 193; *Matter of Van Berkel* v. *Power,* 16 N Y 2d 37, 40).

In considering the attack leveled against the legislation creating the additional Court of Claims Judges, we start with the undeniable fact that the Constitution imposes no limitation upon the number of Court of Claims Judges which may be authorized by the Legislature. This point is crucial, since only a clear violation of the Constitution will justify the court's overruling of the legislative will (*Farrington* v. *Pinckney,* 1 N Y 2d 74, 78; *Matter of Ricker* v. *Village of Hempstead,* 290 N. Y. 1, 5). The Legislature found that the nature and extent of the drug problem created a crisis which could only be met by the enactment of a "tough" drug law, the implementation of which necessarily required legislation providing for the appointment of additional Judges to serve on a temporary basis. The legislation here under attack solved that problem by authorizing the appointment of up to 68 Court of Claims Judges, with the announced purpose that they be assigned to sit in the Supreme Court to handle the anticipated volume of cases which would come before the courts as a result of the new drug legislation and its no-plea bargain provisions and mandatory penalties. The statute, however, does not mandate that these newly appointed Judges sit as acting Supreme Court Justices. They are simply available for such assignments by order of the Appellate Division as there is a need therefor. The new Court of Claims judgeships thus authorized are nonrenewable at the end of their nine-year terms and no successors are to be appointed if such judgeships shall become vacant for any reason whatsoever.

The various petitioners contend that, at least in the Second Judicial District, additional Supreme Court Justices could have been authorized. They argue that the statute is simply a device to circumvent the constitutional requirement of *election* of Supreme Court Justices and the substitution therefor of a system of gubernatorial *appointment.* However, the wisdom of a particular statute is beyond the scope of judicial review (*Nettleton Co.* v. *Diamond,* 27 N Y 2d 182, 194, *supra*) and we may not substitute our judgment for that of the Legislature in determining how to deal with what it has declared to be an emergency situation. It is self-evident that to have dealt with

the emergency situation through the wholesale creation of additional Supreme Court judgeships would have been to ignore the (hopefully) temporary nature of the problem. Such judgeships would continue indefinitely and could have created an expensive *permanent* pool of unneeded judicial manpower. The method selected by the Legislature recognized the temporary nature of the drug emergency and sought to meet it on the basis of a temporary remedy and we may not, unless we are to intrude on the broad powers of the Legislature in such matters, hold that it exceeded its legal powers in determining that appointments of Judges for nine years, or less, exceeded the permissible definition of " temporary ".

In *Matter of Commission of Investigation of State of N. Y.* v. *Lombardozzi* (7 A D 2d 48, 53, affd. 5 N Y 2d 1026) the court held that, judged by any standard, the five-year duration of the Temporary State Commission of Investigation established that it was a temporary commission and hence one created for " special purposes " within the exception to the constitutional prohibition against the creation of new State civil departments.

The Temporary State Commission of Investigation, which was created for a five-year term in 1958, is still in existence pursuant to subsequent legislative enactments. The first two-year extension of the commission was held not to have transformed it into a permanent department, as its life was to statutorily terminate at the end of the period of extension (*Matter of Cronin* v. *Temporary N. Y. State Comm. of Investigation,* 19 A D 2d 689, affd. 13 N Y 2d 941).

The commission has now been in existence for 15 years. Its character was again recently held to be temporary, as every statute extending its life has contained a specific termination date and as there had been no showing of an intention by the Legislature to continue its existence beyond the respective dates of termination (*Matter of McArdle* v. *Curran,* 42 A D 2d 85). In *McArdle* the court held that the petitioners had not overcome their heavy burden of demonstrating unconstitutionality beyond a reasonable doubt, particularly as the renewal or extension of the commission was dependent upon succeeding Legislatures and not upon the decision of a particular group of legislators at a given time.

Similarly, there has been no showing in the instant case of any legislative intention to extend the term of the additional Court of Claims Judges beyond their nine-year terms; nor may we assume that the various Appellate Divisions will seek or extend the assignment of the Court of Claims Judges to the

Supreme Court if and when the current emergency ends. Consequently, the various petitioners have not sustained the heavy burden of demonstrating the invalidity of the legislation beyond a reasonable doubt.

### SEPARATION OF POWERS

The Cullum petitioners argue that section 1 of chapter 603 violates the principle of separation of powers as expressed in section 28 of article VI of the State Constitution. Section 1 provides that the State Administrator of the Courts (an appointee of the Administrative Board of the Judicial Conference [see Judiciary Law, § 211]) and the Commissioner of the Division of Criminal Justice Services (an appointee of the Governor [see Executive Law, § 836 (renumbered from § 822, by L. 1973, ch. 603, § 13)]) are to *jointly* prepare a plan for the efficient application of existing judicial resources and the new resources now available by virtue of chapter 603. Further, none of the moneys provided by this act for court parts, facilities or ancillary court services is to be apportioned by the Director of the Budget until such plan is prepared by the above-mentioned persons. Upon adoption by the Administrative Board of the Judicial Conference, the plan is to be *jointly* implemented by the Administrator and the Commissioner.

Section 28 of article VI of the State Constitution vests the authority and responsibility for the administrative supervision of the State's unified court system in the Administrative Board, which is to consist of the Chief Judge of the Court of Appeals, as Chairman, and the Presiding Justices of the Appellate Divisions. This board, in consultation with the Judicial Conference, is to establish general standards and administrative policies. The Appellate Divisions are vested with authority to supervise the administration and operation of the courts in their respective departments.

The Cullum petitioners contend that the authority vested in the Commissioner of Criminal Justice Services by chapter 603 represents an improper intrusion of the executive branch of government into the affairs of the judicial branch, in violation of the doctrine of separation of powers as embodied in section 28 of article VI of the State Constitution. That contention has been held to have merit (see *Matter of Posner* v. *Rockefeller*, 75 Misc 2d 875), but I believe that they lack standing to raise it.

In *St. Clair* v. *Yonkers Raceway* (13 N Y 2d 72) a sharply divided court applied the rule that the constitutionality of a State statute may be tested only by one personally aggrieved

thereby and then only if the determination of the grievance requires a determination of constitutionality. An unaggrieved citizen-taxpayer, who had placed several small wagers, was held to lack standing to attack a provision of the Pari-Mutuel Revenue Law.

In *Matter of Spillane* v. *Katz* (25 N Y 2d 34, *supra*) the petitioners brought suit to compel all elections to the office of Judge of the Civil Court of the City of New York to be held on a county-wide rather than district-wide basis. The court passed upon the issue, notwithstanding the fact that the petitioners lacked standing, because (a) the respondents had submitted the merits of the inherent constitutional issue to the court and (b) the troublesome questions which would arise with regard to the validity of the elections and the legality of the orders and judgments to be made by the affected Judges required resolution of the issue.

Thereafter, in *Matter of Posner* v. *Rockefeller* (26 N Y 2d 970) the appellants, citizens, taxpayers and Assemblymen, were held not to have standing to challenge the constitutionality of certain appropriation bills. Three of the Judges concurred under constraint of the *St. Clair* decision (*supra*). A similar result was reached in *Hidley* v. *Rockefeller* (28 N Y 2d 439), in which three Judges once again dissented.

Applying the standards laid down in the cases above cited, I have concluded that while the petitioners have standing to complain of the legislation authorizing the appointment of the additional Court of Claims Judges, and their subsequent assignment to the Supreme Court — since, as defendants in criminal cases, they are *directly* affected thereby — they lack standing to complain of the authority statutorily conferred upon the Commissioner of the Division of Criminal Justice Services. Their complaint in that regard does not involve the validity of the judicial appointments or assignments; nor will a failure to resolve that issue, as was the case in the *Spillane* case (*supra*), create subsequent problems with regard to the legality of the orders and judgments to be made by the affected Judges. Thus, the petitioners are not aggrieved by the conferring of authority upon a member of the executive branch of government with regard to court administration; nor have they demonstrated that they will in any way be personally aggrieved if a plan for the proper application of judicial resources is jointly promulgated by the State Administrator of the Courts and the Commissioner of the Division of Criminal Justice Services rather than by the State Administrator acting alone. If the legislative and executive branches of the government have trespassed upon

the right of the judicial branch, it is for the latter to take such action in that regard as it considers necessary and appropriate.

For the foregoing reasons, the motions of the respondents should be granted and the petitions dismissed, without costs.

HOPKINS, Acting P. J., MUNDER, MARTUSCELLO and LATHAM, JJ.. concur.

Motions to dismiss the petitions granted and petitions dismissed, on the law, without costs.